**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| LAMONT WILLIAMSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12-CV-1548 CAS |
| | ) | |
| TROY STEELE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants Lola Ann Brannum, Charles Lawson, and

Charles Sullens's motion for summary judgment. Also before the Court is defendants Corizon, Inc.,

Jean Daugherty, and William McKinney's motion for summary judgment. Plaintiff opposes the

motions. The motions are fully briefed and ripe for review. For the following reasons, the Court

grants defendants Corizon, Inc., Jean Daugherty, William McKinney and Lola Ann Brannum's

motions for summary judgment and dismisses plaintiff's claims against these defendants. The Court

denies Charles Lawson and Charles Sullens's motion for summary judgment.

### *I. Background*

Plaintiff Lamont Williamson is a prisoner residing at the Southeast Correctional Center in

Charleston, Missouri. At all times relevant to this suit, he was an inmate at the Potosi Correctional

Center ("PCC"). In his Third Amended Complaint ("Complaint"), plaintiff brings claims pursuant

to 42 U.S.C. § 1983 for violations of his civil rights and under state law for negligence.[1] Plaintiff

---

[1]After defendants moved for summary judgment, plaintiff filed a motion for leave to file a
Third Amended Complaint to add claims against defendants in their individual capacities. The
motion was unopposed. The Court granted leave to amend, but noted that there were pending
motions for summary judgment. The Court indicated that it would construe the motions for

brings his claims against Corizon, Inc., a professional healthcare company that specializes in providing medical care in correctional facilities; William McKinney, M.D., a medical provider for Corizon, Inc.; Nurse Jean Daugherty, a medical provider for Corizon, Inc.; Charles Lawson, a corrections officer at PCC; Charles Sullens, a corrections officer at PCC; and Lola Ann Brannum, a corrections officer at PCC. The individual defendants are being sued in their individual and official capacities.

In his Complaint, plaintiff brings the following seven (7) counts: deliberate indifference to serious medical needs against Corizon, Inc. (Count I); medical negligence against Corizon, Inc. (Count II); deliberate indifference to serious medical needs against defendants McKinney and Daugherty (Count III); medical negligence against defendants McKinney and Daugherty (Count IV); failure to protect against defendants Lawson and Sullens (Count V); negligence against defendants Lawson and Sullens (Count VI); and deliberate indifference to serious medical needs against defendant Brannum (Count VII). For relief, plaintiff is asking for money damages, punitive damages, attorneys' fees, and costs. He is not asking for injunctive relief.

Defendants Lawson, Sullens, and Brannum filed a motion for summary judgment. In their motion, these defendants make the following arguments for dismissal: (1) plaintiff's claims against defendants in their official capacities are barred by sovereign immunity; (2) defendants Sullens and Lawson were not deliberately indifferent to plaintiff's safety; (3) defendants Sullens and Lawson

_____

summary judgment as being directed to the Third Amended Complaint, unless defendants provided notice to the Court that they required supplemental briefing to address new issues raised in the amended complaint. Defendants indicated to the Court in writing that they did not require supplemental briefing.

are entitled to official immunity as to plaintiff's state law claims of negligence against them in their individual capacities; and (4) defendant Brannum is entitled to qualified immunity as to plaintiff's federal claims against her in her individual capacity.

Defendants Corizon, Inc., McKinney, and Daugherty filed a separate motion for summary judgment. These defendants make the following arguments for dismissal: (1) defendants McKinney and Daugherty were not deliberately indifferent to plaintiff's serious medical needs; (2) plaintiff fails to establish a deliberate indifference claim against Corizon, Inc., because he has not shown that the agency's policies, regulations or decisions were the cause of his harm; (3) plaintiff's state law claim of medical negligence fails to comply with Missouri Revised Statute §538.225.1, which requires plaintiff to produce a health care affidavit; and (4) plaintiff cannot establish that defendants Corizon, Inc., McKinney, or Daugherty were medically negligent in treating plaintiff.

## II. Summary Judgment Standard

The Eighth Circuit has recently articulated the appropriate standard for consideration of motions for summary judgment, as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted). "Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078–79 (8th Cir. 2008) (cited case omitted).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving the parties' motions for summary judgment.

## III.  Facts

### A.  The May 23, 2011 Altercation

In May 2011, plaintiff was incarcerated at PCC.  Defendants Sullens, Lawson, and Brannum were corrections officers at PCC in May 2011.  On May 23, 2011, plaintiff and his cell-mate, Issa Emerson were involved in a physical altercation in their cell.  During the altercation, Emerson threw hot coffee on plaintiff's face.  Plaintiff punched Emerson, bit him and grabbed his testicles.  Plaintiff tried to stab Emerson, but he could not find a weapon.

Defendant Sullens was working in plaintiff's housing unit that day and was the first officer to respond to the cell after he heard the commotion from the fight.  Defendant Sullens called for assistance, and defendant Lawson and Corrections Officer I Brian Brown ("COI Brown") also responded to the fight in plaintiff's cell. After defendant Lawson and COI Brown arrived at the cell, the door was opened and defendant Sullens sprayed pepper spray inside the cell.

The parties dispute as to what happened next.  Viewing the record in the light most favorable to plaintiff, one or more of the officers entered the cell, and defendant Sullens pulled plaintiff out

of his cell onto the catwalk. Plaintiff began to walk away, but defendant Sullens told plaintiff to get down on the ground near the entrance to the cell. With plaintiff face down, defendant Sullens kneeled on plaintiff's thighs, pinning him to the ground, and started to cuff him with his hands behind his back. While plaintiff was pinned down in front of his cell, COI Brown walked Emerson out of the cell directly in front of plaintiff. Defendant Sullens grabbed plaintiff by his arms and lifted plaintiff up so that he was "hanging there." While plaintiff's head was lifted, Emerson was walked by and he kicked plaintiff in the face "like a soccer ball." Defendants did not take any steps to prevent the kick.[2] Following the assault, Emerson was escorted downstairs. Defendant Lawson picked up plaintiff and marched him down the stairs to the medical unit.

---

[2]Defendants maintain that Emerson was not escorted out of the cell, but rather he emerged suddenly and kicked plaintiff in the head. Defendants argue that the Court must disregard plaintiff's version of the event because a surveillance video directly contradicts plaintiff's statement of the facts, which relies on plaintiff's own deposition tesitmony. The Court has carefully reviewed a copy of the surveillance video, which defendants' provided to the Court. The surveillance video is of poor quality. It was filmed across the housing unit from a distance of what the Court would estimate to be approximately 50 feet. Only the catwalk and the exterior of the cells are visible. The figures are blurry, and it is impossible to distinguish one officer from another. In fact, at times it is difficult to determine whether there were two or three officers standing outside plaintiff's cell. The video does contradict some of plaintiffs statements, more specifically that he walked two to two and a half cell-lengths and then was called back to the front of his cell before he was cuffed. That said, the Court cannot discount plaintiff's version of the facts entirely. Most importantly, for purposes of this motion, the Court cannot definitely determine from the video whether Emerson emerged from the cell on his own, or whether he was escorted. The Court also cannot determine whether defendant Sullens lifted plaintiff's head prior to him being kicked.

The Court does note that plaintiff disputes the authenticity of the surveillance video. He claims that the video does not depict the incident outside his cell on May 23, 2011. Defendants, however, provided the Court with an affidavit attesting to the authenticity of the surveillance video and its accuracy. The Court will consider the video for purposes of summary judgment.

## B.    Medical Treatment

Plaintiff was escorted to the medical unit.  Defendant Daugherty, a nurse on duty, conducted a chemical use of force assessment because plaintiff had come in contact with pepper gas. Defendant Daugherty noted that plaintiff complained of injuries to his ankle, wrist, and face from a fight. Defendant Daugherty observed plaintiff walk into the medical unit with a steady gait, she noted that he was alert and oriented, and that his breath was regular and non-labored. Defendant Daugherty further observed that plaintiff had full range of motion in his wrist and ankle with no swelling or tenderness with movement. Plaintiff refused assessment of his vital signs, such as his blood pressure, heart rate, respiratory rate, temperature, weight, oxygen saturation.  Defendant Daugherty observed that plaintiff's right side of his face was red, and that both his upper and lower lips were bleeding. Defendant Daugherty also noted a chin abrasion.  Defendant Daugherty irrigated the abrasions with a sterile solution and instructed plaintiff to return if there were any signs or symptoms of infection. Plaintiff was allowed to shower off his head only.  Plaintiff told defendant Daugherty that he had hot coffee thrown on his face, and he asked to go to the hospital.  Defendant Daugherty responded that he could not go to the hospital.

Plaintiff walked out of the medical unit with a limp and was escorted to 2 House where he was placed in administrative segregation.  Two hours after being escorted to administrative segregation, plaintiff washed his face and saw that pieces of his skin had peeled off.  Between 11:00 and 11:30 p.m., plaintiff was escorted to the medical unit with complaints that he "had hot coffee thrown in [his] face and [his] skin is peeling off."  Plaintiff also complained that he could not hear out of his ear, and he again asked to go to the hospital.  Plaintiff was assessed by a nurse, who contacted the on-call physician and received orders to place plaintiff into the Transitional Care Unit

("TCU"), also known as the infirmary, until plaintiff could be evaluated the next morning by the site physician. The on-call physician also ordered Silvadene, an antibacterial topical cream, to be applied to the burn areas and morphine for pain.

Sometime the following morning, plaintiff was examined and evaluated by site physician, defendant William McKinney, M.D. Dr. McKinney noted that plaintiff reported loss of hearing in plaintiff's right ear and had minimal to no complaints of discomfort to his face. Dr. McKinney observed that plaintiff's hearing was intact for normal conversation. Dr. McKinney was unable to visualize plaintiff's eardrum due to a blister in plaintiff's ear canal. Plaintiff believes Dr. McKinney popped the blister in his ear during the examination. Plaintiff testified that Dr. McKinney told him that he had third degree burns. Dr. McKinney ordered plaintiff admitted into the TCU for further observation. He ordered that plaintiff's wounds be cleaned with soapy water and that Silvadene ointment should be applied. Dr. McKinney prescribed to plaintiff morphine sulfate and Tylenol with codeine for pain. Dr. McKinney also submitted a referral request to have plaintiff evaluated by an outside plastic surgeon after the extent of the burns were known, which could take a few days to show.

On May 25, 2011, Dr. McKinney met with and examined plaintiff during Dr. McKinney's TCU rounds. Plaintiff reported no pain to his face, no change to his right ear, and that the medication was controlling his pain. Dr. McKinney issued orders to continue the current plan of care and he was prepared to send plaintiff to the plastic surgeon if medically indicated. On May 26, 2011 at 10:15 a.m., Dr. McKinney met with and examined plaintiff during his TCU rounds. Plaintiff reported no facial pain, a decrease in right ear pain, and additional skin sloughing off in the shower the night before. Dr. McKinney noted improvement to the burn areas, which were formerly white but were

now presenting with a pink wound base. Dr. McKinney issued orders to continue the current plan of care. On May 27, 2011 at 8:00 a.m., Dr. McKinney met with and examined plaintiff during his TCU rounds. Plaintiff reported no pain in his face or ear, but that he was still having trouble hearing out of his right ear. Dr. McKinney noted "good color of face" and observed that plaintiff's right ear canal was obstructed by a blister. Dr. McKinney amended the pain management plan to include Tylenol as needed, and Tylenol with codeine for break through pain. Dr. McKinney ordered to continue current burn care.

On May 29, 2011, plaintiff reported to the TCU nurse that his right ear had been draining and he could now hear out of his right ear. On May 30, 2011 at 8:00 a.m., Dr. McKinney met with and examined plaintiff during his TCU rounds. Plaintiff reported to Dr. McKinney that the blister in plaintiff's right ear broke and drained and that plaintiff's hearing had improved. Plaintiff continued to affirm that he had no pain on the right side of his face. Dr. McKinney noted that plaintiff's skin looked "great" and had dramatically improved since the last time Dr. McKinney examined plaintiff on May 27, 2011, and, as such, Dr. McKinney doubted Plaintiff would need to be evaluated by the plastic surgeon. Dr. McKinney discussed his assessment with plaintiff and issued orders to continue the current plan of care.

On May 31, 2011 at 7:30 a.m., Dr. McKinney met with and examined plaintiff during his TCU rounds. Plaintiff reported no pain in his face. Dr. McKinney noted that plaintiff's facial burns had almost completely healed and his skin was returning to original coloring, by which Dr. McKinney was impressed. Dr. McKinney determined the plastic surgeon consultation was no longer necessary and issued an order to discontinue the referral. Dr. McKinney also noted that he would be discharging plaintiff from the TCU.

On June 1, 2011, Dr. McKinney discharged plaintiff from the TCU and noted the following in his discharge notes:

> Face: epithelialization of burns to Rt side of face is amazing [sic] good. Nontender. Swelling of lips essentially resolved [with] slight tenderness at periphery. Site of 2nd degree burn Rt upper arm is nearly healed, much smaller and good red base. Rt Ear: currently filled [with] silvadene. Hearing had returned to [normal] 5/31/11. Doc. 108, Ex. D at 1209-1210.

Dr. McKinney requested to follow up with plaintiff in seven to ten days, ordered the nursing staff to clean the remaining burn sites daily and apply Silvadene, and issued a note excusing plaintiff from work until June 10, 2011.

Plaintiff's burn sites were cleaned and Silvadene applied by the nursing staff on June 2, 2011 and on June 3, 2011 at 9:00 a.m., at which time the nurse noted plaintiff's wounds had completely healed. The dressing changes were thereafter discontinued.

On June 3, 2011 at 3:00 p.m., plaintiff was assessed by defendant Daugherty for complaints of pain in his right ear after plaintiff put water in his ear to clean it. Defendant Daugherty wrote in the medical notes that plaintiff's inner ear appeared pink and white with no signs or symptoms of infection. Plaintiff denies that defendant Daugherty looked into his ear. Defendant Daugherty was aware that plaintiff had an order for Tylenol to be taken as needed. She inquired whether plaintiff had taken any Tylenol, and plaintiff acknowledged that he had not. Plaintiff agreed to take the Tylenol to relieve his pain. Defendant Daugherty instructed plaintiff to report back to medical if plaintiff exhibited any signs or symptoms of infection or if plaintiff experienced an increase in pain.

That same day at 6:30 p.m., plaintiff self-declared a medical emergency for complaints of water coming from his ear causing pain. Defendant Daugherty assessed plaintiff and determined that plaintiff's complaint was non-urgent. Plaintiff denies defendant Daugherty examined his ear.

Defendant Daugherty instructed plaintiff on how to properly access medical for nonemergency situations by submitting a medical services request ("MSR"), and to return to medical if plaintiff's symptoms worsened.

On June 5, 2011 at 12:00 a.m., plaintiff self-declared a medical emergency complaining of pain in and drainage from his right ear. Plaintiff was assessed and appeared to be in no distress. The nurse instructed plaintiff to place a medical service request in order to schedule an appointment with the site physician. That same day at 2:15 a.m., plaintiff self-declared a medical emergency complaining that the ear pain was getting worse. The nurse assessed plaintiff. She noted that plaintiff's right ear canal was very tender during examination. Plaintiff denies that the nurse examined his ear. The nurse contacted the on-call physician who ordered pain medication and that plaintiff be observed in the TCU overnight and re-assessed in the morning.

On June 6, 2011 at 7:45 a.m., Dr. McKinney met with and examined plaintiff during his TCU rounds. Dr. McKinney noted that plaintiff's ear drum was red and that plaintiff had a second degree burn in his right ear canal, but was in no distress. Dr. McKinney questioned whether the redness was related to the burn or to an ear infection. Dr. McKinney issued an order for amoxicillin for the possible infection. He ordered plaintiff to continue taking Tylenol as needed and discharged plaintiff back to his housing unit.

Shortly after plaintiff's appointment, Dr. McKinney became aware that plaintiff was allergic to penicillin, which is in the same class of antibiotics as amoxicillin. Dr. McKinney discontinued plaintiff's prescription for amoxicillin and issued an order for Septra. One of the nurses retrieved the amoxicillin from plaintiff and provided him the 30-day supply of Septra. Plaintiff denies that he was given Septra. He notes that with regard to Septra, he did not sign a Medical Administration

Record, which would have been required by the Missouri Department of Corrections ("MDOC"). Plaintiff took one amoxicillin and experienced minimal itching but did not have any serious reactions or require medical attention.

On June 7, 2011 at 4:30 a.m., plaintiff self-declared a medical emergency for complaints that his ear was draining. The nurse noted,

> [I]nmate saw md yesterday for the same complaints and was started on antibiotic and he was told he would have some drainage of the right ear and to not put a cotton ball in it just to let it drain. [I]nmate has scant amount of light yellowish drainage from right ear informed him to keep right outer ear clean and dry. [I]nmate became belligerent he started to yell…This nurse felt threatened because he started to yell and treaten [sic] me by becoming violent…[S]tates he will just keep on self-declaring and become violent until someone sends him out to the hospital for his ear infection.

Doc. 108, Ex. D at 1222-23. During the examination plaintiff complained of pressure in his head. Plaintiff testified that no one looked in his ear. The nurse believed plaintiff's complaint was not urgent, and she instructed plaintiff on how to access medical care through the sick call process.

On June 10, 2011, Dr. McKinney met with plaintiff for a follow-up appointment. Plaintiff reported that the burn sites were healed, but that he still had decreased hearing in his right ear. Plaintiff also reported that he stopped taking the Septra after nine doses. Dr. McKinney noted that plaintiff's right ear canal was open and clear but that there was a blister on the ear drum with some redness. Concerned that plaintiff had a slight ear infection, Dr. McKinney issued an order to replace the Septra with cephalexin and requested to follow up with plaintiff in approximately two weeks.

On June 27, 2011 at 10:45 a.m., Dr. McKinney met with Plaintiff for a follow up appointment. Dr. McKinney noted that Plaintiff had previously reported having no hearing in his right ear, but that plaintiff was now reporting his hearing was worse because he only had 15% hearing in his right ear. Dr. McKinney examined Plaintiff and noted that plaintiff's right ear canal

was open with slight drainage and the ear drum presented with red streaks and small blisters. Dr. McKinney requested plaintiff to complete a Valsalva maneuver[3] to assess whether inner ear pressure was affecting plaintiff's hearing. Dr. McKinney issued an order for antibiotic ear drops to treat any possible infection. Plaintiff requested an x-ray of his ear and to be sent out to an optometrist or an ear, nose and throat specialist. Dr. McKinney informed plaintiff that he was clinically improving and that in Dr. McKinney's medical judgment, a referral to an ear, nose and throat specialist was not medically indicated. Dr. McKinney requested to follow up with plaintiff in one month to evaluate the effectiveness of the prescribed treatment and to continue to monitor and evaluate plaintiff's hearing.

On July 4, 5, and 6, 2011, plaintiff refused administration of the prescribed eardrops. On July 25, 2011, plaintiff was scheduled for a follow up appointment with Dr. McKinney for purposes of continuing to monitor and evaluate plaintiff's ear and hearing. Plaintiff refused to be seen by Dr. McKinney. Plaintiff was transferred to Eastern Reception, Diagnostic and Correctional Center on October 25, 2011.

## IV. Discussion

### A.    Sovereign Immunity

Plaintiff brings claims are against defendants in their official and individual capacities. Defendants Sullens, Lawson and Brannum have moved to dismiss the claims brought against them in their official capacities on the basis of sovereign immunity. Claims brought against a defendant in his or her official capacity are assumed to be claims against the defendant's public employer,

_____

[3]A Valsalva maneuver forces air from the oral cavity into the middle ear to make the ear drum move and was used here by Dr. McKinney to assess plaintiff's complaint that he had decreased hearing. Doc. 108, Ex. A at 41-42.

which in this case is MDOC. Hafer v. Melo, 502 U.S. 21, 25 (1991) (citing Kentucky v. Graham, 473 U.S. 159, 169 (1985)). States are entitled to sovereign immunity from damages liability under § 1983 Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989), Monroe v. Arkansas State Univ., 495 F.3d 591, 594 (8th Cir. 2007), and the Eleventh Amendment prohibits the imposition of monetary damages against the state, or against state officials in their official capacities. Edelman v. Jordan, 415 U.S. 651, 663 (1974); Nix v. Norman, 879 F.2d at 432-33 & n.3 (8th Cir. 1989). Plaintiff's claims for monetary damages against defendants in their official capacities are barred by sovereign immunity. The Court grants summary judgment in favor of defendants Sullens, Lawson, and Brannum as to plaintiff's claims against them in their official capacities.

B.    **Failure to Protect Claims**

1.    *Defendants Sullens and Lawson*

In Count V of his Complaint, plaintiff alleges that defendants Sullens and Lawson were deliberately indifferent to his safety when they failed to properly restrain plaintiff's cellmate following the altercation on May 23, 2011. Plaintiff alleges that defendants Sullens and Lawson failed to take reasonable steps to protect him in that he was restrained, and they knowingly placed his cellmate in the proximity of plaintiff where he was in a position to further assault plaintiff, which he did. Defendants Sullens and Lawson move for summary judgment on the basis that the facts in this case do not support plaintiff's claim.

The Supreme Court has instructed that the Eighth Amendment imposes on prison officials the duty to "provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials are required to take reasonable measures to "protect [detainees] from violence at the hands of other prisoners." Id. (internal punctuation and quoted case omitted). The

13

Eighth Amendment imposes this duty because being subjected to violent assaults is not "part of the penalty that criminal offenders pay for their offenses." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). To prevail in a suit under 42 U.S.C. § 1983, an inmate seeking damages from prison officials for failing to protect him or her from assault by another inmate must show:

> that the prison official was deliberately indifferent to a "substantial risk of serious harm." Young v. Selk, 508 F.3d 868, 872 (8th Cir. 2007) (quoting Farmer, 511 U.S. at 828). In doing so, a prisoner must satisfy two requirements, one objective and one subjective. The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious; i.e., whether the inmate "is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. The second requirement is subjective and requires that the inmate prove that the prison official had a "sufficiently culpable state of mind." Id. (quotation omitted). In prison conditions claims, which include the failure-to-protect allegations[ ], the subjective inquiry regarding an official's state of mind is one of " 'deliberate indifference' to inmate health or safety." Id. (quoting Wilson v. Seiter, 501 U.S. 294, 302–03 (1991)). An official is deliberately indifferent if he or she actually knows of a substantial risk and fails to respond reasonably. Id. at 837.

Whitson v. Stone Cnty. Jail, 602 F.3d 920, 923 (8th Cir. 2010). See also Walls v. Tadman, 762 F.3d 775, 782 (8th Cir. 2014).

Defendants Sullens and Lawson argue that they were negligent, at most, in breaking up the fight between plaintiff and his cellmate. Their argument is based on their version of the facts, which is that while they were attempting to restrain plaintiff outside of the cell on the catwalk, his cellmate exited the cell on his own and kicked plaintiff in the head. They state in their memorandum in support of summary judgment that, "[a]t the time Emerson emerged suddenly from his cell and kicked plaintiff in the head, defendants were doing their best to quell a scuffle between closely confined cellmates that had turned dangerously violent." Doc. 103 at 5. Plaintiff disputes defendants' version of the facts. He presented evidence, namely his own testimony, that while defendant Sullens had him restrained on the ground and was kneeling on his back, COI Brown

escorted Emerson from the cell right in front of plaintiff and defendants allowed Emerson to kick plaintiff in the head. In fact, he testified that defendant Sullens raised his head so that Emerson could kick him in the face.

In their reply memorandum, defendants contend that plaintiff's version of the facts is "sensational and absurd." Doc. 126 at 3. They argue that plaintiff's version is "directly contradicted" by the surveillance video and, therefore, the Court should disregard plaintiff's version of the facts for purposes of summary judgment. Notably, defendants do not make the alternative argument that even if the Court were to adopt plaintiff's facts, they are still entitled to summary judgment.

As stated above, the Court has carefully reviewed the surveillance video a number of times. The quality of the video is poor and it was filmed from a distance. Only the catwalk and the exterior of the cells are visible. The figures are shadowy and it is impossible to distinguish one officer from another. In fact, it is difficult at times to determine how many figures are standing outside the cell. The video does contradict some of plaintiff's statements, for example plaintiff's claim that after he was pulled from his cell, he limped two to two and a half cell lengths down the catwalk. But the Court cannot discount plaintiff's version of the facts entirely. Court cannot definitely determine from the video whether Emerson emerged from the cell on his own, or whether he was escorted by one of the officers. The Court also cannot determine whether defendant Sullens lifted plaintiff's head so that Emerson could kick him in the face. And finally, the Court is unable to determine whether defendants attempted to do anything to prevent Emerson from attacking plaintiff while plaintiff was in a vulnerable position and under defendants' control.

Defendants correctly point out that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). But here, the Court finds that plaintiff's story is not "blatantly contradicted" by the video. Even after viewing the surveillance video, a reasonable juror could still believe critical aspects of plaintiff's version of the facts.

After examining the record in this case, the Court finds there remain issues of material fact as to whether plaintiff faced a substantial risk of harm when he was pinned to the ground in front of his cell, and whether defendants acted with reckless disregard of his right to be free from violent attacks by a fellow inmate. Farmer, 511 U.S. at 837, Young, 508 F.3d at 872 , Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003). Defendants Sullens and Lawson have not shown to the Court's satisfaction that they are entitled to summary judgment as a matter of law with regard to plaintiff's claim of failure to protect.

## 2. *Qualified immunity*

In their memorandum in support of summary judgment, Sullens and Lawson state in one sentence, without providing any analysis, that they are entitled to qualified immunity.[4] In the Court's view, defendants Lawson and Sullens have not properly raised the issue of qualified immunity in their motion and memoranda. But even if the Court were to examine the issue, the Court finds they are not entitled to summary judgment on the basis of qualified immunity.

---

[4]Defendants write, "[i]ndeed, even if Plaintiff could show that Defendants Sullens and Lawson could have done more to protect him from Emerson, Defendants would nevertheless be entitled to qualified immunity. See, e.g., Rellergert v. Cape Girardeau County, 924 F.2d 794, 797 (8th Cir. 1991)." Doc. 103 at 5.

"Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Howard v. Kansas City Police Dep't., 570 F.3d 984, 988 (8th Cir. 2009).  The court may first address either prong.  Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009).

For purposes of summary judgment, defendants Sullens and Lawson are not entitled to qualified immunity.  Based on Supreme Court precedent, it is clearly established that  prison officials are required to take reasonable measures to "protect [detainees] from violence at the hands of other prisoners."  Farmer, 511 U.S. at 832 (1994); Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997) ("if [defendant] had ignored the procedures for isolating [the dangerous offender] and intentionally opened [his] cell door for the purpose of assisting [him] in assaulting others, that intent to cause harm would clearly constitute deliberate indifference for Eighth Amendment purposes. Likewise, if [defendant] had opened [the dangerous offender]'s cell door knowing that harm to other inmates would almost certainly result, [defendant]'s conduct would constitute deliberate indifference.").

As for the first prong, whether defendants Sullens and Lawson violated plaintiff's constitutional rights, viewing the facts in a light most favorable to plaintiff, the Court finds there is evidence to demonstrate that Sullens and Lawson violated plaintiff's rights under the Eighth

Amendment. Defendants knew of the risk Emerson posed to plaintiff having just broke up a fight between the inmates, and yet by escorting Emerson out of the cell right in front of plaintiff they placed Emerson in close proximity to plaintiff, where he could assault plaintiff while plaintiff was on the ground, defenseless, and under one of the defendant's control. Thus, there remain issues of disputed facts that preclude the Court from finding Sullens and Lawson are entitled to qualified immunity. Sullens and Lawson's motion for summary judgment, based on qualified immunity, to the extent they are asserting it, should therefore be denied.

### 3. *State law negligence claims*

In Count VI of his Complaint, plaintiff alleges that defendants Sullens and Lawson were negligent under Missouri state law in their failure to secure Emerson before he kicked plaintiff in the head. Defendants make two arguments in support of summary judgment with regard to this state law claim.

### a. *Criminal act of third party*

Citing to a 1977 insurance case involving a shooting and a motor vehicle accident, Ford v. Monroe, 559 S.W.2d (Mo. Ct. App. 1977), defendants Lawson and Sullens first argue that they cannot be held liable for the criminal action of a third party. Generally, one person owes no duty to protect another from a deliberate criminal attack by a third person. Faheen v. City Parking Corp., 734 S.W.2d 270, 272 (Mo. Ct. App. 1987). " Exceptions to the general no-duty rule [can . . ] arise from 'special relationships' or from 'special facts and circumstances,' such that an act or omission exposes a person to an unreasonable risk of harm through the conduct of another." Knop v. BiState Dev. Agency of the Mo.-Ill. Metro. Dist., 988 S.W.2d 586, 589 (Mo. Ct. App. 1999) (citing Schelp Cohen-Esrey Real Estate Servs., 889 S.W.2d 848, 850–851 (Mo. Ct. App. 1994) (disagreed with

on other grounds by Richardson v. QuikTrip Corp., 81 S.W.3d 54, 59 (Mo. Ct. App. 2002)).

"Special relationships" include those situations where a party entrusts himself or herself to the protection of another and relies upon that person to provide a place of safety. Schelp, 889 S.W.2d at 851. The "special facts and circumstances" exception includes two theories: (1) an intentional infliction of injury by known and identifiable third persons; or (2) frequent and recent occurrences of violent crimes against persons on the premises by unknown assailants. Id.

Missouri courts have recognized jailers owe a duty to inmates in custody to protect them from assaults from other inmates. See, e.g., State ex rel. Miser v. Hay, 328 S.W.2d 672, 676 (Mo. 1959) (plaintiff, who was assaulted by other inmates, " presents a case of alleged negligence, arising out of the alleged failure of the defendant [ ] to exercise ordinary care for the safety of the plaintiff while in his custody).[5] Defendants Sullens and Lawson, who are the parties moving for summary judgment, cite to the general rule and fail to mention the exceptions. They have done nothing to demonstrate why they, as custodians of plaintiff, would not owe a duty to protect plaintiff from an

---

[5]The Restatement of Torts also recognizes a jailer or warden had a duty of care to protect inmates from attacks with third party inmates:

> Duty of Person Having Custody of Another to Control Conduct of Third Persons – One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
>> (a)    knows or has reason to know that he has the ability to control the conduct of the third persons, and
>> (b)    knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 320 (1965)

attack from a fellow inmate under Missouri law. The Court will not grant summary judgment based on this argument.

### b. Official immunity

Defendants also assert that they are entitled to official immunity on plaintiff's state law negligence claims because their actions in breaking up the fight were discretionary, and there is no evidence they committed a willful or malicious wrong in breaking up the fight between plaintiff and his cellmate.

"Under Missouri law, the official immunity doctrine protects public officials from liability for injuries arising out of their discretionary acts or omissions, but not from liability in claims arising from their performance of ministerial acts." Reasonover v. St. Louis Cnty., Mo., 447 F.3d 569, 585 (8th Cir. 2006) (cited case omitted). Official immunity does not apply, however, to discretionary acts done in bad faith or with malice. Id.; State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 446 (Mo.1986) (en banc). "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury." Twiehaus, 706 S.W.2d at 447. "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id. (internal punctuation and quoted case omitted). "Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." Id. (brackets and quoted case omitted).

In this case, defendants Sullens and Lawson did exercise discretion in attempting to break up the fight between plaintiff and Emerson. See, e.g., Teasley v. Forler, 548 F. Supp. 2d 694, 710 (E.D. Mo. 2008) (maintaining security over someone is discretionary law enforcement function because it requires professional judgment as to the existence or level of threats). There is a dispute of fact, however, as to whether Sullens and Lawson acted maliciously toward plaintiff. Although defendants deny plaintiff's version of the facts, he maintains and has presented admissible evidence, namely his own testimony, that defendants pinned him the ground and set up the attack by Emerson. Conway v. St. Louis Cnty. Mo., 254 S.W.3d 159, 165 (Mo. Ct. App. 2008) (malice requires intent to injure another); Teasley, 548 F. Supp. 2d at 710 (malice involves conscious wrongdoing). Therefore, defendants Sullens and Lawson are not entitled to official immunity from suit on plaintiff's state law negligence claims, and the Court denies their motion for summary judgment on this ground.

### C. Medical Claims

#### 1. *Deliberate indifference to serious medical need – McKinney and Daugherty*

In Count III of his Complaint, plaintiff alleges defendants McKinney and Daugherty were deliberately indifferent to plaintiff's serious medical needs, including second and third degree burns to the right side of plaintiff's face, second and third degree burns in plaintiff's right ear, an ear infection and pain. The Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from "deliberate indifference to serious medical needs." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000).

In a deprivation of medical care case, the inmate must show (1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately

indifferent to it.  See Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).  "An objectively

serious medical need is one that either has been diagnosed by a physician as requiring treatment, or

is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'"

Jones v. Minnesota Dep't of Corrs., 512 F.3d 478, 483 (8th Cir. 2008).  See also Coleman v. Rahija,

114 F.3d 778, 784 (8th Cir. 1997).  "'To establish a constitutional violation, it is not enough that a

reasonable official should have known of the risk."  Rather, a plaintiff must demonstrate the official

actually knew of the risk and deliberately disregarded it.'"  Vaughn v. Greene Cnty., Ark., 438 F.3d

845, 850 (8th Cir. 2006) (quoting Farmer, 511 U.S. at 837).  The determination that prison officials

had actual knowledge of a serious medical need may be inferred from circumstantial evidence or

from the very fact that the risk was obvious.  See Farmer, 511 U.S. at 842; Jones, 512 F.3d at 483.

If prison officials have actual knowledge of a serious medical need, and fail to take reasonable

measures to address it, they may be held liable for deliberate indifference.  See Farmer 511 U.S. at

847.  That said, "[a] showing of deliberate indifference is greater than gross negligence and requires

more than mere disagreement with treatment decisions."  Pietrafeso v. Lawrence Cnty., S.D., 452

F.3d 978, 983 (8th Cir. 2006) (quoting Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006)).

When an inmate alleges that a delay in medical treatment rises to the level of an Eighth

Amendment violation, "the objective seriousness of the deprivation should also be measured 'by

reference to the effect of delay in treatment.'"  Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir.

1995), abrogation on other grounds recognized by Reece v. Groose, 60 F.3d 487, 492 (8th Cir. 1995)

(quoting Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994)).  Therefore,

the inmate "must place verifying medical evidence in the record to establish the detrimental effect

of delay in medical treatment." Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (quoting

Hill, 40 F.3d at 1188).  To prevail on a claim that a delay in medical care constituted cruel and unusual punishment, an inmate must show both that: (1) the deprivation alleged was objectively serious; and (2) the prison official was deliberately indifferent to the inmate's health or safety.  Id. When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the "objective seriousness of the deprivation should also be measured 'by reference to the effect of delay in treatment.'"  Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (affirming the district court's grant of defendants' motion for summary judgment because plaintiff failed to offer evidence establishing any delay in treatment had a detrimental effect).

Allegations of medical malpractice, inadvertent failure to provide adequate medical care, or simple negligence do not amount to a constitutional violation.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Popoalii v. Correctional Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008); Smith v. Clarke, 458 F.3d 720, 724 (8th Cir. 2006).  Rather, the standard is met when the complainant establishes that the official "intentionally den[ied] or delay[ed] access to medical care, or intentionally interfer[ed] with treatment or medication that has been prescribed." Vaughan v. Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995). Furthermore, "prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment," since prisoners do not have a right to any particular course of medical care. Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996) (citing Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994)); Taylor v. Turner, 884 F.2d 1088, 1090 (8th Cir. 1989). "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment." Long, 86 F.3d at 765. Accordingly, under Eighth Circuit law, "mere disagreement with

treatment decisions does not rise to the level of a constitutional violation." Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)).

Plaintiff alleges in his Complaint that the second and third degree burns on his face and right ear and the subsequent ear infection that developed constitute a serious medical need. For purposes of summary judgment, defendants do not dispute that plaintiff had a serious medical need. What is at issue is whether defendants McKinney and Daugherty knew of these medical conditions and were deliberately indifferent to them.

The undisputed facts in this case show that plaintiff was assessed and treated on a regular basis for his facial burns and complaints of ear pain. Plaintiff was examined on a daily basis while he was admitted to the TCU, and he was treated on a regular basis following his discharge. Plaintiff was given medicines for pain, and Dr. McKinney prescribed ointment for plaintiff's burns and topical antibiotic eardrops and oral antibiotics for his ear infection.

In responding to defendants' motion for summary judgment, plaintiff does not specify in what way defendants McKinney and Daugherty were deliberately indifferent to his medical needs, but rather he states "There is abundant evidence in the record that both Dr. McKinney and Nurse Daugherty failed to provide for his serious medical needs. See Facts 58-70. There are genuine issues of material fact which preclude Summary Judgment on the § 1983 claim." Doc. 121 at 3. The Court has reviewed plaintiff's additional facts in paragraphs 58-70 – the paragraphs plaintiff references – and plaintiff appears to be making the following complaints against defendants McKinney and Daugherty regarding his medical care: (1) Nurse Daugherty did not refer plaintiff to a hospital following the altercation; (2) Dr. McKinney did not refer plaintiff to an ENT specialist; (3) during two visits to the medical unit on June 3, 2011, Nurse Daugherty did not examine plaintiff's ear; (4)

Dr. McKinney prescribed him amoxicillin, to which plaintiff is allergic; (5) plaintiff was not given Septra; and (6) Dr. McKinney popped a blister in plaintiff's ear.

The fact that plaintiff was not referred to a hospital or seen by an outside specialist does not establish deliberate indifference. It is undisputed that plaintiff requested a number of times that he receive care at a hospital or by a specialist, but he has provided no evidence, other than his own opinion, that he required outside medical care. "Prisoners do not have a right to any particular course of medical care." Long, 86 F.3d at 765; Taylor, 884 F.2d at1090. Dr. McKinney noted that if necessary he would refer plaintiff to an outside specialist, but according to the record, in his medical judgment, that need never arose. Plaintiff may disagree with Dr. McKinney's opinion, but under Eighth Circuit law, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg, 56 F.3d at 37). The Court finds defendants were not deliberately indifferent to plaintiff's medical needs by refusing to refer plaintiff to a specialist.

Plaintiff maintains that defendant Daugherty failed to examine his ear when he made two visits to the medical unit on June 3, 2011. This fact is disputed, and the written record supports defendant Daugherty's assertion that she examined plaintiff's ear. However, viewing the facts in the light most favorable to plaintiff, as the Court must do on summary judgment, the fact that defendant Daugherty did not examine plaintiff's ear on June 3, 2011, does not establish deliberate indifference that rises to the level of a violation under § 1983. Dr. McKinney treated plaintiff three days later on June 6, 2011, so plaintiff's assertion that defendant Daugherty's did not examine his ear is essentially an argument that there was a delay in treatment. A delay in medical treatment is not an automatic constitutional violation. In determining whether a delay rises to the level of an

Eighth Amendment violation, a district court is to measure the "objective seriousness of the deprivation . . . by reference to the effect of delay in treatment." Laughlin, 430 F.3d at 929. Here, plaintiff presented no evidence whatsoever as to the effect the three-day delay had on his ear infection. There is no evidence that the delay caused some sort of long-term or permanent damage. Plaintiff does not assert what treatment he should have received, or that defendant Daugherty's failure to examine his ear caused him further pain. What is more, when plaintiff was seen on June 3, 2011, he admitted he had not been taking his pain medicine, and he was encouraged to do so.

When plaintiff was seen on June 6, 2011, Dr. McKinney did prescribe plaintiff amoxicillin, a medication that is closely related to a medicine to which plaintiff is allergic. Plaintiff has provided no opinion evidence or authority that prescribing amoxicillin to a patient who is allergic to penicillin rises to level of deliberate indifference. Furthermore, the error was corrected. Dr. McKinney discontinued plaintiff's prescription for amoxicillin and issued an order for Septra, a different antibiotic. In the meantime, plaintiff took only one dose of amoxicillin and experienced minimal itching, but did not have any serious reactions or require medical attention. The fact that Dr. McKinney erroneously prescribed plaintiff a medication to which he may have been allergic – an error that was quickly corrected – does not rise to the level of deliberate indifference.

Plaintiff refutes that he was given the antibiotic Septra. He asserts that he could not have been given Septra, because he did not sign a Medical Administration Record, which would have been required by MDOC. First, MDOC's procedures regarding prescription medications are not before the Court. Based on the record before it, the Court is unable to determine whether plaintiff would have been required, pursuant to MDOC procedures, to sign a Medical Administration Record. Second, whether MDOC procedures may or may not have been followed with regard to the Septra

is a different issue than whether Dr. McKinney was deliberately indifferent to plaintiff's ear infection. There is evidence that Dr. McKinney prescribed plaintiff Septra on June 6, 2011. What plaintiff really disputes here is whether the drug was actually dispensed, which may or may not have been under Dr. McKinney's control.[6]  But even if the Court were to assume that plaintiff did not receive Septra on June 6, 2011, on account of Dr. McKinney's actions, it is undisputed that on June 10, 2011 – four days later – Dr. McKinney prescribed another oral antibiotic, cephalexin, and plaintiff does not claim that he did not receive this medicine.  There is no evidence in the record that this course of treatment was not appropriate, or how any supposed delay in prescribing plaintiff antibiotics caused plaintiff harm. Plaintiff has not placed "medical evidence in the record to establish the detrimental effect of delay in medical treatment." Crowley, 109 F.3d at 502. What is more, there is evidence in the record that Dr. McKinney also prescribed plaintiff topical antibiotic drops for his ear.   But on July 4, 5, and 6, 2011, plaintiff refused administration of the antibiotic eardrops, and later that month, plaintiff refused to be seen by Dr. McKinney.

Finally, plaintiff alleges that Dr. McKinney popped a blister in his ear.  It is undisputed that before or during the altercation with his cellmate, plaintiff's cellmate threw hot coffee in plaintiff's face, and he sustained burns in his right ear canal.  Plaintiff asserts that during the course of his medical treatment, Dr. McKinney popped a blister in his ear.  Accepting the disputed fact as true for purposes of summary judgment, this does not establish deliberate indifference on the part of Dr. McKinney.  There is no evidence in the record as to what is the appropriate treatment for a burn blister.   The Court is not a medical professional, and without the opinion of a medical expert, the

_____

[6]Plaintiff assertion that he never received Septra is undermined by the fact that on June 10, 2011, it was noted in the medical records that plaintiff reported that he stopped taking Septra after only nine doses.

27

Court cannot conclude as a matter of law that popping a blister is not a "reasonable measure" for addressing a burn in an ear canal. See Farmer 511 U.S. at 847.

In sum, even if the Court accepts plaintiff's version of the facts with regard to his medical care, there is nothing in the record to establish that defendants McKinney and Daugherty violated plaintiff's Eighth Amendment constitutional rights. Plaintiff has not established that there is a triable issue as to whether defendants McKinney and Daugherty deliberately disregarded his serious medical needs. The Court grants summary judgment in defendants favor as to Count III of the Complaint.

### 2.  Deliberate indifference to serious medical need- Corizon, Inc.

In Count I of his Complaint, plaintiff brings § 1983 claims against Corizon, Inc., a corporate defendant for deliberate indifference to his serious medical needs. Citing to Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978), Corizon, Inc. moves for summary judgment on the ground that plaintiff has failed to allege any unconstitutional violation based on "an implemented or executed policy, regulation or decision adopted by and promulgated by the agency." Doc. 107 at 11. The Court agrees that plaintiff's § 1983 claims against defendant Corizon should be dismissed.

Corporations acting "under color of state law" are liable under § 1983 for their own unconstitutional policies or customs. Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975–76 (8th Cir.1993). To state a claim against private corporation acting under color of state law, plaintiff must allege existence of "policy, custom, or official action that caused actionable injury" Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975–76 (8th Cir.1993). Corporations acting under color of state law may not be held vicariously liable for the unconstitutional acts of their employees under

the theory of <u>respondeat</u> <u>superior</u>. <u>Boyd v. Knox</u>, 47 F.3d 966, 968 (8th Cir.1995).  Plaintiff admits

in his response memorandum that defendant Corizon cannot be held liable under 42 U.S.C § 1983

on a <u>respondeat</u> <u>superior</u> theory, and he fails to set forth any "policy, custom, or official action" of

Corizon, Inc. that caused him injury.  Therefore, the Court will grant summary judgment and dismiss

plaintiff's § 1983 claim against Corizon, Inc.[7]

### 3.  *Deliberate indifference to serious medical need – Defendant Brannum*

Plaintiff alleges in Count VII of his Complaint that defendant Brannum, a corrections officer

with the MDOC, was deliberately indifferent to his medical needs because she did not notify her

supervisors when she observed plaintiff receiving inadequate medical care in the infirmary.   There

is no evidence that defendant Brannum is a trained medical professional.  Absent evidence that the

care provided by medical staff was so poor that even a layperson must have recognized its

inadequacy, defendant Brannum cannot be held liable. <u>Cf</u>. <u>Krout v. Goemmer</u>, 583 F.3d 557, 569

(8th Cir. 2009) ("[t]hat a trained medical technician did not appreciate the risks attendant to

[decedent's] condition undermines an inference that the untrained officers obviously knew

[decedent] was at serious risk"). Furthermore, in this case, there is no evidence that the care plaintiff

received was deficient, let alone obviously so.  Plaintiff argues in his response memorandum that

defendant Brannum was present almost every day plaintiff received or requested medical treatment

and she knew, despite plaintiff's requests, that he was never taken to see an outside provider for

either his burns to the damage to his ear.  As stated above, plaintiff has presented no evidence that

---

[7]Even if plaintiff could establish a claim against Corizon, Inc. based on the conduct of its employees, there is no evidence that defendants McKinney and Daugherty, Corizon, Inc. employees, deliberately disregarded plaintiff's serious medical needs.

he required treatment from an outside medical provider.  Therefore, the Court grants defendant Brannum summary judgment.

### 4.       *State law claims of medical negligence*

Plaintiff has alleged in Count II and IV of his Complaint claims for medical malpractice against defendants Corizon, Inc., McKinney and Daugherty. These defendants move for summary judgment on two grounds.  First, they argue plaintiff's state law claims of medical negligence fail because he has not produced a health care affidavit in compliance with Missouri Revised Statute §538.225.1.  The Court declines to address this argument, and instead the Court will address defendants' alternative argument, whether plaintiff has failed to present evidence of medical malpractice against defendants Corizon, Inc., McKinney and Daugherty.

Under Missouri law, in order to establish a claim for negligence, a plaintiff must prove: "(1) the existence of a duty on the part of the defendant to protect the plaintiff from injury, (2) a failure of the defendant to perform that duty, and (3) an injury proximately caused by the defendant's failure." Blevens v. Holcomb, 469 F.3d 692, 694 (8th Cir. 2006) (citing Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo.1990) (en banc)). In a medical malpractice case, the plaintiff must show that the defendant failed to use "that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession." Id. (quoting Swope v. Printz, 468 S.W.2d 34, 39 (Mo.1971)).  In most instances, "a plaintiff cannot state a prima facie case of medical negligence without expert testimony describing how the defendant's conduct fell below the applicable standard of care." Id. (citing Hart v. Steele, 416 S.W.2d 927, 931–32 (Mo.1967)). The specific duty required of the defendant is defined by the profession, and an "expert witness is generally necessary to tell [the fact finder] what the defendant should or should not have done under

the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession." Ostrander v. O'Banion, 152 S.W.3d 333, 338 (Mo. Ct. App. 2005).

To establish causation, the plaintiff is required to demonstrate not only proximity in time, but also a showing that plaintiff would not have been injured but for defendant's negligence. Delisi v. St. Luke's Episcopal-Presbyterian Hosp., 701 S.W.2d 170, 175 (Mo. App. 1985). In other words, plaintiff must show that the physician's conduct was the but-for cause and the proximate cause of plaintiff's damages. Ploch v. Hamai, 213 S.W.3d 135, 141 (Mo. App. 2006). Expert testimony is also required to establish causation. Delisi, 701 S.W.2d at 175 (plaintiff failed to show, by independent medical evidence, that the administration of any particular antibiotic would have been effective in controlling or preventing the infection) Thus, in order avoid summary judgment, plaintiff must present specific facts demonstrating that defendants McKinney and Daugherty beached their standards of care, and that their breaches caused his injuries.

With regard to Dr. McKinney, plaintiff has not proffered any expert testimony with regard to his standard of care or how it was breached. Plaintiff's claim of malpractice against Dr. McKinney is based on his own opinions, and he does little to explain the course of care Dr. McKinney should have employed. Under Missouri law, plaintiff has failed to demonstrate that Dr. McKinney did not use the degree of skill and learning ordinarily used under same or similar circumstances by other physicians during the course of treatment provided to plaintiff for complaints of facial burns, inner ear burns, accompanying pain, and hearing loss. Blevens, 469 F.3d 692. Plaintiff also failed to present evidence that he suffered injuries as a result of Dr. McKinney's

actions. Plaintiff does not even try to explain how Dr. McKinney's treatment caused him further injuries.

Likewise, plaintiff has failed to demonstrat that defendant Daugherty did not use the degree of skill and learning ordinarily used under same or similar circumstances by other nurses when defendant Daugherty assessed plaintiff following the May 11, 2011 altercation, and in plaintiff's subsequent visits to the medial unit. As with Dr. McKinney, plaintiff's medical negligence claim against defendant Daugherty rests on plaintiff's own opinion, and he does not explain what her course of treatment should have been. In addition, plaintiff has set forth no facts demonstrating that defendant Daugherty's actions caused him injury.

As for defendant Corizon, Inc., plaintiff's claim fails because he has not demonstrated that either defendant Daugherty or Dr. McKinney, employees of Corizon, Inc., were negligent in the care they provided plaintiff. In addition, plaintiff failed to explain in his response memorandum how Corizon, Inc. was medically negligent. The Court grants defendants Corizon, Inc., McKinney, and Daugherty summary judgment with regard to plaintiff's claims of medical negligence under Missouri state law.

## V. Conclusion

For the foregoing reasons, the Court concludes plaintiff has failed to establish that defendants Corizon, Inc., McKinney, Daugherty, and Brannum were deliberately indifferent to his serious medical needs. Plaintiff has also failed to establish medical negligence on the part of Corizon, Inc., McKinney, and Daugherty. The Court will grant these defendants summary judgment as to Counts I, II, III, IV, and VII of plaintiff's Complaint. The Court further finds that while defendants Sullens and Lawson are entitled to sovereign immunity with regard to plaintiff's claims against them in their official capacities, there are outstanding issues of material fact that preclude the entry of summary judgment as to plaintiff's claims against defendants Lawson and Sullens for failure to protect under

42 U.S.C. § 1983 and for common law negligence in their individual capacities – Counts V and VI. Therefore, the Court will set this case for trial.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Lola Ann Brannum, Charles Lawson, and Charles Sullens's motion for summary judgment is **GRANTED in part and DENIED in part.** Defendant Lola Ann Brannum is entitled to summary judgment as to all claims against her. Defendants Charles Lawson and Charles Sullens are entitled to summary judgment as to claims against them in their official capacities. The motion is denied in all other respects. [Doc. 102]

**IT IS FURTHER ORDERED** that defendants Corizon, Inc., William McKinney, and Jean Daugherty's motion for summary judgment is **GRANTED.** [Doc. 106]

An appropriate Partial Judgment will accompany this memorandum and order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this __9th__ day of June, 2015.